# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of:<br><br>D.C.,<br><br>Appellant. | No. 59344-1-II<br><br>UNPUBLISHED OPINION |

LEE, J. — D.C. appeals the superior court's order committing him to 90 days of involuntary treatment pursuant to RCW 71.05.020(25)(b). D.C. argues the superior court failed to make findings necessary to support its conclusion that D.C. is gravely disabled. We affirm.

## FACTS

### A. BACKGROUND

In June 2023, D.C. was arrested and charged with felony residential burglary after D.C. entered a property, took something from the kitchen, and refused to leave the property for several hours. Prior to the felony burglary charge for the June 2023 incident, D.C.'s criminal history included convictions for multiple gross misdemeanors (two criminal trespasses and a third-degree malicious mischief), multiple misdemeanors (four criminal trespass), and an unclassified charge of malicious mischief. Including the June 2023 arrest, D.C. had a total of nine arrests between 2011 and 2023.

D.C. also had five prior mental health hospitalizations—three detainments for grave disability, three detainments for posing a danger to property, and a one-month hospitalization for

grave disability. After D.C.'s June 2023 arrest, he was admitted to Western State Hospital (WSH) for two periods of competency restoration.

In October, a Dr. Bergkamp[1] opined that D.C. was not competent based on a diagnosis of unspecified schizophrenia spectrum disorder and other psychotic disorder. On December 18, after considering an evaluation report dated December 7 and by agreement of the parties, the trial court issued an order dismissing the felony burglary charge against D.C. and ordering a civil commitment evaluation. At the time of the order, D.C. was already at WSH.

B.    INVOLUNTARY TREATMENT PETITIONS

D.C. underwent a 35-minute mental status exam (MSE) on December 19 at WSH. During the MSE, D.C. denied having committed burglary, explaining that he "'didn't [break] the entry'" and "'heard voices from friends telling me go ahead you can enter.'" Clerk's Papers (CP) at 10. On December 22, Nitin Karnik, M.D., the examining physician, and Rosario Archer, Ph.D. an examining mental health professional, filed a 180-day involuntary treatment petition.

On January 12, 2024, D.C. participated in a 15-minute MSE. That same day, Dr. Archer and Mehrban Parsi, D.O., a new petitioner, filed an amended 180-day involuntary treatment petition.[2] However, the amended petition was filed without Dr. Parsi's signature. An identical amended petition was filed on January 16 with both petitioners' signatures.

---

[1] It is unclear from the record if Dr. Bergkamp is associated with Western State Hospital (WSH). The record suggests that Dr. Bergkamp works at WSH because he deemed D.C. not competent after diagnosing him and D.C. was at WSH prior to his mental status exam (MSE).

[2] There was confusion during Dr. Archer's testimony about dates she met with D.C. While initially Dr. Archer testified to meeting with D.C. on January 12, 2024, Dr. Archer did not actually meet with, or speak to D.C. on January 12. Rather, prior to January 12, Dr. Archer coordinated with Dr. Parsi about D.C.'s mental health status "by phone, by Teams, by email" and after the

The December 22, 2023 and January 16, 2024 petitions were substantively similar. However, the January 16 petition appears to be based on Dr. Archer's December 22 petition, with Dr. Parsi's opinions written in parentheticals based on Dr. Parsi's January 12 MSE.[3]

According to the January 16 amended petition,[4] D.C. needed further treatment at WSH because he was gravely disabled. In the declaration supporting the petition, the petitioners diagnosed D.C. with unspecified schizophrenia spectrum and other psychotic disorder. CP at 25. Petitioners stated that D.C.'s "cognitive control is compromised by his disorganized thinking," D.C. "does not have control of his thoughts," and D.C."presents delusional belief system leading to distorted interpretations of reality." CP at 25. Additionally, D.C. did not participate meaningfully in therapy due to cognitive symptoms. D.C.'s attention, concentration, comprehension, short- and long-term memory were all impaired "as a result of unremitting thought disorganization symptoms." CP at 23. D.C.'s disorganized thinking was evidenced by his "rambling, derailed speech" categorized as "nonsensical, tangential, [and] irrelevant." CP at 23.

---

coordination, both petitioners combined records and came up with and co-signed the final document. 1 Verbatim Rep. of Proc. (VRP) (Jan. 25. 2024) at 62.

[3] Prior to January 12, 2024, Dr. Archer provided Dr. Parsi with a copy of her draft report from the December 19 MSE. Dr. Parsi presented his input and made red-lined additions to the petition for Dr. Archer. Dr. Parsi testified to red-lined additions; however, the record does not show the additions in red. Both Dr. Parsi and Dr. Archer concurred with the information in the filed January 16 petition. Dr. Archer believed the findings were "very rich" and "very powerful" because Dr. Parsi's findings, at the time, were as D.C.'s treating psychiatrist—Dr. Parsi saw D.C. on an ongoing basis. 1 VRP (Jan. 25, 2024) at 56.

[4] Because the January 16 petition was an amended petition that included both Dr. Archer's December 19, 2023 observations and Dr. Parsi's January 12, 2024 observations, we will reference only the January 16 amended petition.

D.C. presented with delusions that disconnected him from reality, causing D.C. constant stress, and causing him to misinterpret the actions and motivations of those around him. D.C. informed Dr. Parsi he heard voices coming from God that made him feel special. D.C. also reported the "voices [sometimes] make [him] kind of angry." CP at 24.

D.C. was unaware of what was expected of him to remain safe in the community and prevent rehospitalization. D.C. told petitioners his plan to transition into the community was to "'go back to the streets.'" CP at 24. When petitioners asked D.C. what he would do if he caught a cold or the flu while homeless, D.C. initially responded, "'[C]ellphone but I don't have, I'd go to Bates school.'" CP at 24. D.C. continued, "'I'll use marijuana to keep me warm like these gloves keep my hand warm, I'll use marijuana if I get the cold. But . . . I don't have money . . . I'd buy 6 bucks of marijuana and will smoke one joint. Yes alcohol too.'" CP at 24 (alterations in original). D.C. also stated if he had a car, he would take pills. When pressed for clarification, D.C. became irritable.

D.C. informed petitioners he did not like taking medication, claimed to be "'normal,'" and denied having a mental disorder. CP at 24. In support of their petition, petitioners stated that D.C.'s "[c]ore symptoms persist despite two periods of restoration." CP at 25. Overall, the amended petition indicated that D.C. had impaired insight into his own mental illness and to the benefit of medications. And the petitioners did not believe D.C. was ready for a less restrictive placement since D.C.'s psychotic symptoms impacted his ability to objectively appreciate his needs.

C.      GRAVE DISABILITY HEARING

A hearing on the petition was held on January 19, 2024. At the hearing, the State notified the superior court commissioner that the State was proceeding on grave disability only and would seek only 90 days of commitment instead of 180 days.

1.      Dr. Parsi's Testimony[5]

Dr. Parsi is a psychiatrist at WSH. At the time of Dr. Parsi's testimony, he was D.C.'s treating psychiatrist. D.C. first came under Dr. Parsi's care on January 5, 2024. Dr. Parsi saw D.C. daily and conducted evaluations and interviews at least once a week.

Dr. Parsi conducted an MSE on D.C., which consisted of a chart review, patient observation and interview, treatment team meetings, and collateral information gathered from those meetings, and diagnosed D.C. with schizophrenia spectrum disorder and other psychotic disorders. Dr. Parsi's diagnosis was based on D.C.'s presentation of several symptoms including: auditory hallucinations; delusions and paranoid ideations; "alogia," or "poverty of speech"; disorganized thoughts leading to disorganized behaviors; difficulty understanding treatment and discharge plans; and poor insight into his mental health condition. 1 Verbatim Rep. of Proc. (VRP) (Jan. 19, 2024) at 16.

D.C.'s schizophrenic symptomatology affected D.C.'s cognitive control. D.C. had difficulty maintaining thoughts regarding his discharge planning, maintaining discussions generally, and a history of confusion. Additionally, D.C.'s delusions and auditory hallucinations

---

[5] Dr. Parsi testified first at the hearing on January 19, 2024. During his testimony, Dr. Parsi referenced notes that had not been provided to D.C.'s counsel. The court commissioner granted D.C.'s motion to continue the matter to January 25.

made it difficult for D.C. to understand the realities around him. Specifically, D.C. had a confused perception of (1) what caused his hospitalization; (2) his family relationships; and (3) his mental health condition.

D.C.'s diagnosis impaired his judgment. From a psychiatric standpoint, unimpaired judgment means "really understanding why you are taking medication and continuing the medication." 1 VRP (Jan. 19, 2024) at 16. While D.C. took medication with encouragement from WSH staff, D.C. disclosed to Dr. Parsi that that he would not take his medication upon discharge because he did not believe he had schizophrenia; rather, D.C. believed he merely had ADHD. Due to that belief, D.C. was "ambivalent about taking medication." 1 VRP (Jan. 19, 2024) at 23. As such, Dr. Parsi opined that D.C. would not be able to ensure his own basic health and safety needs if D.C. were released from WSH.

Dr. Parsi provided other examples of D.C.'s inability to ensure his own health and safety needs. Dr. Parsi testified that while D.C. was at WSH, D.C. was diagnosed with low blood pressure. Despite this diagnosis, WSH staff had to consistently ask and encourage D.C. to drink more fluids. Also, D.C. admitted he was still hearing voices and hearing God's voice. D.C. starved himself due to his auditory hallucinations. Additionally, while at WSH, D.C. declined lab work, preventing staff from understanding D.C.'s physical health. During D.C.'s time at WSH, he was minimally engaged in non-medication treatment. For example, D.C. would engage "superficially" and leave the activities "after a while." 1 VRP (Jan. 19, 2024) at 21.

Dr. Parsi also testified about D.C.'s pattern of hospitalizations. Every time D.C. was off medication, he encountered problems and decompensation leading to detainments. Although D.C. indicated he "might take medication if he ha[d] a car," Dr. Parsi attributed this to D.C.'s

6

disorganized thoughts. 1 VRP (Jan. 19, 2024) 23. The aforementioned examples, combined with Dr. Parsi's review of D.C.'s charts, previous evaluations, and previous hospitalizations, led Dr. Parsi to conclude that D.C. was unlikely to take his medication or seek mental health treatment if discharged.

As to D.C.'s safety needs, Dr. Parsi testified that D.C. was vulnerable to environmental factors because D.C. lacked a good discharge plan. D.C. wanted to be discharged to his grandparents, but D.C.'s grandparents did not want D.C. back due to prior transgressions. D.C. did not understand why he could not go to his grandparents or how his "communications with his family ha[d] affected them," resulting in his family not "want[ing] to accept him after that." 1 VRP (Jan. 19, 2024) at 17. When Dr. Parsi met with D.C. on January 19, D.C. wanted to be released to his mother, but that was not a viable option. Dr. Parsi also testified that D.C.'s discharge plan was inadequate. 1 VRP (Jan. 19, 2024) at 18. In fact, D.C. indicated he would "'go back to the streets.'" CP at 24. Dr. Parsi testified that if released, D.C.'s patterns would continue to worsen.

Dr. Parsi testified regarding D.C.'s impaired perception of reality. Dr. Parsi explained that D.C. did not understand, or minimized, the reasons he had been hospitalized. D.C.'s lack of understanding about how his interactions with his family had affected them also showed an impaired perception of reality. And D.C. had paranoid ideations focused on his step-father, which "was a new thing that was coming up." 1 VRP (Jan. 19, 2024) at 30. Based on a conversation he had with D.C.'s social worker, Dr. Parsi opined that D.C.'s ideas of his step-father were false and delusional.

In sum, based on his MSE, Dr. Parsi recommended that D.C. continue to be hospitalized until he was better prepared to transition back into society.

2.      Dr. Archer's Testimony

Dr. Archer is a full-time psychological evaluator at WSH.  After Dr. Archer's MSE of D.C. in December 2023, she met D.C. a second time on January 24, 2024, before the hearing on the petition reconvened.  During that meeting, D.C. did not remember or recall meeting Dr. Archer in December.

Like Dr. Parsi, Dr. Archer diagnosed D.C. with unspecified schizophrenia disorder.  Dr. Archer supported the diagnosis by pointing to D.C.'s continued "distorted thinking, hallucinations, and the delusions [indiscernible] in regards to presence of people who are familiar to him being present in the ward in the room where [Dr. Archer spoke to D.C.]."  1 VRP (Jan. 25, 2024) at 47. For example, D.C. "identified the spirit of his father walking in between him and [Dr. Archer]."  1 VRP (Jan. 25, 2024) at 47.  D.C. "also identified some persons that are part of his productions of videos for TV, which are family members and friends."  1 VRP (Jan. 25, 2024) at 47.

Dr. Archer testified that D.C.'s "cognitive control remains pretty impaired as [D.C.] does not have any control about disturbing processing or flow of psychotic thoughts" or control of "delusional thoughts that implied [sic] not only him but other peoples in the community."  1 VRP (Jan. 25, 2024) at 54.

D.C. also showed a lack of insight because D.C. said he planned to live with his mother upon release.  However, D.C. was also not sure if his mother was dead or alive.  During Dr. Archer's MSE, D.C. even doubted Dr. Archer's existence and did not believe she was a real person.

Additionally, D.C.'s judgment was greatly impaired as a result of his schizophrenia because D.C. was unable to make rational decisions in responding to the environment around him. For example, D.C. misunderstood the 2023 burglary charge because D.C. believed he "just happened to be there and drink a little bit of ginger beer." 1 VRP (Jan. 25, 2024) at 50-51. And D.C. was at high risk of repeating or continuing to present the same disturbance in his behavior as a result of his psychotic symptoms.

D.C. did not agree with the schizophrenia diagnosis and thus did not "see the need of taking medications." 1 VRP (Jan. 25, 2024) at 48. Instead, D.C. only took medication because "they are mandated." 1 VRP (Jan. 25, 2024) at 48. And D.C. was not capable of making rational decisions because D.C. would discontinue medication and resume using marijuana, alcohol, and other substances on release back to the community.

Like Dr. Parsi, Dr. Archer did not believe that D.C. would seek out and follow through with mental health treatment upon release because D.C. did not believe he had any mental health condition. D.C.'s "complex behavioral health needs," including delusions and abnormal perceptional experiences, would be best supported at WSH. 1 VRP (Jan. 25, 2024) at 55.

Overall, Dr. Archer did not believe D.C. would meet his basic health and safety needs if released from WSH. And Dr. Archer did not recommend a less restrictive alternative to hospitalization. Thus, Dr. Archer testified that continued hospitalization was in D.C.'s best interests.

3.      D.C.'s Testimony

During D.C.'s testimony, when asked about his beard and if it is "important to [him]" D.C. responded, "Uh, I will shave one day, but I don't have any—I don't find—besides my relationship

with God or another higher power or whatever, a personal—a beard is just like a judge wearing a suit. It's just a personal—it's a personal trait." 1 VRP (Jan. 25, 2024) at 65.

4. Commissioner's Ruling and Order

The superior court commissioner found that clear, cogent, and convincing evidence proved D.C. was gravely disabled as a result of D.C.'s unspecified schizophrenia disorder because D.C. manifested "severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over actions, is not receiving such care as is essential for health and safety." CP at 32.

In its oral ruling, the commissioner acknowledged that the petitions were "abundantly unclear as to certain things." 1 VRP (Jan. 25, 2024) at 69. However, the commissioner also found that the substance of Dr. Parsi and Dr. Archer's testimonies, in their totality, was sufficient to support a finding of grave disability. The commissioner ordered 90 days of involuntary treatment.

In its written order, the commissioner concluded that D.C., as a result of a behavioral health disorder, "is/continues to be gravely disabled." CP at 33. The commissioner ordered 90 days of involuntary treatment.

The commissioner's written order also provided facts supporting its conclusion of grave disability. The written order stated that between 2014 and 2020, D.C. had five prior hospitalizations with three detainments for grave disability, and four for danger to property. The commissioner also supported the grave disability conclusion with the fact that D.C. "is taking psych meds at WSH. Rambling answers to some questions about his beard (talks about his relation to God)." CP at 33.

The commissioner's written order summarized Dr. Parsi and Dr. Archer's testimonies in the "Facts in Support" section and included parentheticals in the summaries. CP at 32.

D.C. filed a motion for revision of the commissioner's written order. In his motion, D.C. took issue with the State filing three petitions because "some assertions made in [the January 16] petition were . . . inaccurate." CP at 105. D.C. argued that Dr. Parsi's updated information in the petition "appear as almost an afterthought with some not even being complete sentences" and that based on the "totality of the circumstances" Dr. Parsi and Dr. Archer totally disregarded RCW 71.05. CP at 106, 107. D.C. also argued that the State failed to prove by clear, cogent, and convincing evidence that D.C. was gravely disabled because Dr. Archer and Dr. Parsi did not "prove that [D.C.] is not receiving such care as is essential for his health or safety as required under prong 'b.'" CP at 110-11.

The superior court judge denied D.C.'s motion for revision. D.C. appeals.

ANALYSIS

D.C. appeals the order authorizing 90 days of involuntary treatment. D.C. argues that the superior court erred because the findings of fact do not support the conclusion that D.C. was gravely disabled under RCW 71.05.020(25)(b). We disagree.

A.     STANDARD OF REVIEW

A commissioner's ruling is subject to revision by the superior court. RCW 2.24.050. When the superior court denies a motion to revise the commissioner's ruling, the commissioner's decision becomes the superior court's decision. *In re Det. of A.M.*, 17 Wn. App. 2d 321, 330, 487 P.3d 531 (2021). Here, because D.C. moved to revise the commissioner's order and the superior

court denied that motion, the commissioner's order has become that of the superior court.[6] On appeal, we review the superior court's ruling, not the commissioner's decision. *A.M.*, 17 Wn. App. 2d at 330.

We will not disturb the superior court's findings of grave disability "if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986); RCW 71.05.310. The evidence must be more substantial than in an ordinary civil case, and factual findings must "be supported by substantial evidence in light of the 'highly probable' test." *LaBelle*, 107 Wn.2d at 209 (quoting *In re Pawling*, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)). Under the highly probable test, "'the ultimate fact in issue must be shown by evidence to be highly probable.'" *A.M.*, 17 Wn. App. 2d at 330 (internal quotation marks omitted) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).

Substantial evidence is that which is sufficient to persuade a fair-minded person that the premise is true. *Id.* Challenges to the sufficiency of the evidence are reviewed in the light most favorable to the State. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459, *review denied*, 193 Wn.2d 1017 (2019). Moreover, we do not review a superior court's determination of witness credibility or the persuasiveness of the evidence. *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021), *review denied*, 199 Wn.2d 1009 (2022).

---

[6] D.C.'s order has expired. However, this appeal is not moot because an involuntary commitment order has collateral consequences for future commitment determinations. *In re Det. of M.K.*, 168 Wn. App. 621, 626, 279 P.3d 897 (2012) (stating "each commitment order has a collateral consequence in subsequent petitions and hearings, allowing us to render relief if we hold that the detention under a civil commitment order was not warranted").

B.    GRAVE DISABILITY UNDER RCW 71.05.020(25)(b)

1.    Legal Principles

A person is gravely disabled if they satisfy the statutory definition for grave disability under RCW 71.05.020(25)(a) or (b).  The statutory provision at issue here is the definition of grave disability under subsection (b).  Per that definition, a person is "gravely disabled" when, "as a result of a behavioral health disorder," the person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety."  RCW 71.05.020(25)(b).

Specifically, the petitioners must demonstrate "(1) severe deterioration in routine functioning as evidenced by 'recent proof of significant loss of cognitive or volitional control' and (2) 'a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety.'"  *A.M.*, 17 Wn. App. 2d. at 335 (quoting *LaBelle*, 107 Wn.2d at 208).  Showing that care and treatment of an individual's mental illness would be preferred, beneficial, or in the individual's best interest is not enough.  *LaBelle*, 107 Wn.2d at 208.

It is implicit under prong (b) that the respondent "is *unable*, because of severe deterioration of mental functioning, to make a rational decision with respect" to their need for treatment.  *Id.* (emphasis in original).  This requirement is essential to ensure a causal nexus exists between proof of "'severe deterioration in routine functioning'" and proof the person is so affected they are "'not receiving such care as is essential for his or her health or safety.'"  *Id.* (quoting former RCW 71.05.020(1)(b) (1979)).

13

Prong (b) was added by the legislature to "broaden the scope of the involuntary commitment standards . . . to reach those persons in need of treatment for their mental disorders who did not fit within the existing, restrictive statutory criteria." *Id.* at 205-06.

Prior to the addition of prong (b), chronically ill persons could not be involuntarily treated until they had decompensated to the standard in prong (a),[7] when they were in danger of serious harm from an inability to care for themselves. *Id.* at 206. This resulted in "the 'revolving door' syndrome, in which patients often move from the hospital to dilapidated hotels or residences or even alleys, parks, vacant lots, and abandoned buildings, relapse, and are then rehospitalized, only to begin the cycle over again." *Id.* at 206 (quoting Nancy K. Rhoden, *The Limits of Liberty: Deinstitutionalization, Homelessness, and Libertarian Theory*, 31 EMORY L.J. 375, 391 (1982)).

By incorporating the concept of decompensation into prong (b), the legislature permitted the State to intervene and "provide the kind of continuous care and treatment that could break the cycle and restore the individual to satisfactory functioning." *Id.* "Such intervention is consonant with . . . the express legislative purpose[] of the involuntary treatment act." *Id.* A finding of grave disability under prong (b) allows for intervention "before a mentally ill person decompensates and provides for continuity of care." *A.F.*, 20 Wn. App. 2d at 127.

Recognizing the constitutional concerns with the broadened commitment standard under prong (b), *LaBelle* provided "careful guidelines for the kind of evidence that can be used to show that a person is gravely disabled." *In re Det. of M.K.*, 168 Wn. App. 621, 627, 279 P.3d 897 (2012).

---

[7] The standard for prong (a) provides that a person is gravely disabled when, as a result of a behavioral health disorder, the person "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." RCW 71.05.020(25)(a).

Thus, when the State seeks involuntary treatment pursuant to prong (b), it is "particularly important that the evidence provide a factual basis for concluding that an individual 'manifests severe [behavioral health] deterioration in routine functioning.'" *LaBelle*, 107 Wn.2d at 208 (quoting former RCW 71.05.020(1)(b)).

Where it is undisputed that D.C. is suffering from a behavioral health disorder, our inquiry is limited to whether there was substantial evidence that, as a result of that disorder, D.C. is gravely disabled. *Id.* at 209.

2. D.C. Was Gravely Disabled

a. Finding of deterioration from prior baseline not required

D.C. argues that the superior court failed to make essential factual findings to support grave disability. We disagree.

D.C. contends that the superior court must find that he had a prior "baseline" functioning and "severe[] worsen[ing] from a prior state of functioning." Br. of Appellant at 28; Reply Br. of Appellant at 4. However, the plain language of RCW 71.05.020(25)(b) does not require evidence of D.C.'s "baseline" or evidence of a severe worsening from a prior state of functioning. Furthermore, case law does not support D.C.'s proposed standard of establishing a "baseline" or "severe[] worsen[ing] from a prior state of functioning." Br. of Appellant at 28; Reply Br. of Appellant at 4.

i. Statutory language

D.C.'s contention that the superior court did not make essential factual findings to support grave disability is premised on statutory interpretation, which we review de novo. *Lockner v. Pierce County*, 190 Wn.2d 526, 531, 415 P.3d 246 (2018). The starting point for statutory

15

interpretation must always be the plain language of the statute and its ordinary meaning. *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003).

D.C. takes issue with the statutory phrase "severe deterioration in routine function" and argues that the plain meaning of the statute and the dictionary definitions of "deteriorate" and "routine" require evidence and findings that the person to be committed "has severely worsened from a prior state of functioning." RCW 71.05.020(25)(b); Reply Br. of Appellant at 4. However, the plain meaning of the statute does not require evidence of a worsening from a prior state of functioning to prove severe deterioration in routine function. The statute reads ". . . manifests severe deterioration in routine functioning *evidenced* by repeated and escalating loss of cognitive or volitional control over his or her actions." RCW 71.05.020(25)(b) (emphasis added). Thus, the plain language of the statute requires evidence of repeated and escalating loss of cognitive or volitional control to determine "severe deterioration in routine function." RCW 71.05.020(25)(b).

D.C. essentially asks that we ignore the portion of the statute that states "evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions." RCW 71.05.020(25)(b). But statutes must be interpreted and construed so that all the language used is given effect. *State v. Roggenkamp*, 153 Wn.2d 614, 624, 106 P.3d 196 (2005). And we do not read words in isolation or subject words to all possible meanings found in the dictionary. *Id.* at 623; *State v. Lilyblad*, 163 Wn.2d 1, 9, 177 P.3d 686 (2008). We simply may not add or delete language from an unambiguous statute. *J.P.*, 149 Wn.2d at 450.

ii. Case law

D.C. correctly states that *LaBelle*'s admonition requires "'a factual basis for concluding that an individual manifests severe [mental] deterioration in routine functioning'" because of the

16

constitutional concerns as to prong (b)'s applicability.  Br. of Appellant at 31 (alterations in original) (internal quotation marks omitted) (quoting *LaBelle*, 107 Wn.2d at 208).  However, the constitutional concerns relate to persons who could potentially be "involuntarily committed under [prong (b)] solely because they are suffering from mental illness and may benefit from treatment." *LaBelle*, 107 Wn.2d at 207.  As stated in *LaBelle*, "[i]nvoluntary commitment on [that] basis alone is not supported by a sufficiently compelling state interest to justify such a significant deprivation of liberty."  *Id.*

Contrary to D.C.'s argument, *LaBelle* does not stand for the premise that the statute requires "some evidence that the person's behavior represents worsening from some prior level of usual functioning."  Br. of Appellant at 32-33.  Rather, *LaBelle* emphasizes that it is "particularly important that the evidence provide a factual basis for concluding . . . 'deterioration in routine functioning.'"  *LaBelle*, 107 Wn.2d at 208 (quoting former RCW 71.05.020(1)(b)).  Specifically, the evidence must show "recent proof of significant loss of cognitive or volitional control . . . [and] evidence . . . reveal[ing] a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for [their] health or safety."  *Id.*

*LaBelle* and its progeny do not require evidence showing the person's behavior has worsened from some prior level of usual functioning.  Instead, the case law requires a "severe deterioration in routine functioning as evidenced by 'recent proof of significant loss of cognitive or volitional control' and . . . 'a factual basis for concluding the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety.'"  *A.M.*, 17 Wn. App. 2d. at 335 (quoting *LaBelle*, 107 Wn.2d at 208).

17

b.        Factual findings sufficient

D.C. argues that the superior court's commitment order should be reverse because the findings in the order merely parrot statutory language in RCW 71.05.020(25)(b) and recite testimony. D.C. contends that the findings of fact are problematic because they merely recite testimony and posits that "correctly prepared finding[s] of fact" include a "determination regarding the significance or credibility of testimony rather than a mere recitation." Br. of Appellant at 24-25. We disagree that the superior court's findings of fact are deficient.

Findings of fact where language is standardized, are merely cursory checkbox findings, or that only parrot statutory language are generally insufficient to support a trial court's legal conclusions. *See A.F.*, 20 Wn. App. 2d at 123-24. However, here, the superior court's order includes more than just standardized language, parroting of statutory language or checking of boxes. Rather, the superior court's order includes a "Facts in Support" section, wherein the court summarized the testimony presented and added its own commentary about the testimony in parentheses.[8] CP at 32. Moreover, a superior court's reliance on testimony of witnesses is an implied finding by the court of the credibility and reliability of the witnesses.[9] *A.F.*, 20 Wn. App. 2d at 124. Thus, even if the trial court did not make an explicit finding that the doctors' testimonies

---

[8] For instance, in the superior court's summary of Dr. Parsi's testimony, it added several parentheticals: "Jan 12, 2024 for only about 15 minutes!"; "[h]ears the voice of God"; "thinks he has ADHD only"; "labs"; "vacillates where he wants to go"; "no meaningful participation"; "grandparents do not want him and parents have moved out of state." CP at 32. The superior court similarly did so in its summary of Dr. Archer's testimony: "for about 35 minutes"; "[d]id not remember seeing her/meeting her before"; and "thinks all he has is ADHD." CP at 32-33.

[9] We note that best practices would include the court, in addition to reciting the testimony relied on in its rulings, expressly making credibility determinations.

were credible, it is implied that the court found their testimony credible when the court relied on the doctors' testimonies. *Id.* Therefore, when the superior court relied on the testimonies of Drs. Archer and Parsi, the court impliedly found the doctors' testimonies reliable, credible, and significant. *Id.* We will not review the superior court's decision regarding credibility. *Id.* at 125.

Thus, D.C.'s argument that the superior court failed to make sufficient findings of fact fails because the superior court's written order expressly set forth the testimony the court relied upon and included the court's commentary about the testimony, and the superior court impliedly found the doctors' testimony credible when the court relied on their testimony.

        c.       Clear, cogent, and convincing evidence of grave disability exists

D.C. appears to also argue that the record does not have clear, cogent, and convincing evidence to support grave disability. *See* Br. of Appellant at 36 (D.C. asserts, "The question becomes, then, whether undisputed evidence in the trial court record overcomes the lack of the necessary findings."). We disagree.

A person is "gravely disabled" when, "as a result of a behavioral health disorder," the person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(25)(b).

The undisputed evidence in the record shows that D.C. has a behavioral health disorder— D.C.'s diagnosis is unspecified schizophrenia disorder.[10] D.C. does not appear to dispute this diagnosis in his pleadings. Therefore, our inquiry is limited to whether as a result of that behavioral

---

[10] Dr. Archer testified that D.C. suffers from unspecified schizophrenia disorder. Dr. Parsi, who was D.C.'s treating psychiatrist, also diagnosed D.C. with schizophrenia spectrum disorder.

health disorder, there is clear, cogent, and convincing evidence that D.C. "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(25)(b); *LaBelle*, 107 Wn.2d at 209.

> i.    D.C. manifested severe deterioration in routine functioning

There is clear, cogent, and convincing evidence in the record that D.C. manifested deterioration in routine functioning evidenced by repeated and escalating loss of cognitive control over his actions.[11]  The evidence shows that D.C.'s cognitive control "remain[ed] pretty impaired as he [did] not have any control about disturbing processing or flow of psychotic thoughts, delusional thoughts that implied [sic] not only him but other peoples in the community."  1 VRP (Jan. 25, 2024) at 54.

Just prior to D.C.'s December 2023 MSE, he had two periods of restoration for competency, was found not competent, and his symptoms persisted.  Notably, Dr. Parsi and Dr. Archer both testified to symptoms—distorted thinking, hallucinations, and delusions—that demonstrated D.C.'s repeated and escalating loss of cognitive control over his actions.  Also, the record shows D.C.'s symptoms impaired his judgment and perception of reality.  For example, despite his symptoms, D.C. denied having schizophrenia, believed he only had ADHD, and stated he would stop taking medication after discharge from WSH.

Moreover, D.C. exhibited hallucinations and delusions at WSH when he reported seeing the "spirit of his father," seeing persons—"family members and friends"—from his TV video

---

[11] The statute requires a loss of either cognitive or volitional control, and both doctors testified that D.C.'s schizophrenia caused a loss in cognitive control.  RCW 71.05.020(25)(b).

productions, and having paranoid ideations of his step-father.[12]  1 VRP (Jan. 25, 2024) at 47.

Additionally, when D.C. discussed his plan for release, he planned to go to his mother, but also

was not sure if his mother was dead or alive.  And during the December 2023 MSE, D.C. did not

believe Dr. Archer was a real person, and during Dr. Archer's January 24, 2024 encounter, D.C.

did not recall previously meeting her.

D.C.'s auditory hallucinations also impacted his cognitive control.  For example, during

the December 2023 MSE with Dr. Archer, D.C. initially denied, but then reported auditory

hallucinations during the time of the alleged burglary.  D.C. reported his auditory hallucinations

told him to "go ahead you can enter," which led to the June 2023 arrest and residential burglary

charge.  CP at 24.  D.C. stated that he "didn't [break] the entry" because "voices from [his] friends"

told him to enter.  CP at 24.  D.C. also admitted that these voices "sometimes . . . make [him] kind

of angry."  CP  at 24.  D.C.'s auditory hallucinations continued during his time at WSH as he

reported he still heard voices, specifically God's voice, during the MSE with Dr. Parsi.  Also while

at WSH, D.C.'s auditory hallucinations continued to impact his cognitive control because D.C.

starved himself as a result of the auditory hallucinations.

D.C. exhibited confusion as to what caused his hospitalization, as well as confusion around

his plan to be discharged to his parents or grandparents and why such a plan was not feasible.

While D.C. repeatedly stated his plans to be discharged to his family, he was confused as to how

"his communications with his family ha[ve] affected them" because they did not want to "accept

---

[12]  D.C. saw his father and persons from his TV video productions, which he called his family and friends, in the room with him during Dr. Archer's exam on January 24.  D.C.'s paranoid ideations were "new" during Dr. Parsi's MSE on January 12.  1 VRP (Jan. 19, 2024) at 30.

him after that." 1 VRP (Jan. 19, 2024) at 17. D.C.'s disorganized thoughts were apparent when he spoke about his beard, "Uh, I will shave one day, but I don't have any—I don't find—besides my relationship with God or another higher power or whatever, a personal—a beard is just like a judge wearing a suit. It's just a personal—it's a personal trait." 1 VRP (Jan. 25, 2024) at 65. D.C. also exhibited disorganized thoughts when he stated he would only take his medication if he had a car.

D.C.'s judgment was impaired to "a great degree" because D.C. was unable to make rational decisions in responding to the environment around him. 1 VRP (Jan. 25, 2024) at 49. D.C. even stated he would "'go back to the streets'" after discharge and use marijuana and alcohol if he were to catch a cold, or the flu, while homeless. CP at 24. D.C.'s delusions and disconnect from reality make him prone to misinterpreting people and the situations around him.

The evidence showed that D.C. exhibited confusion and disorganized thoughts, delusions, and auditory hallucinations that impaired D.C.'s insight and judgment. This evidence shows it is highly probable that D.C.'s schizophrenia diagnosis manifested a repeated and escalating loss of cognitive control over his actions. As such, there is substantial clear, convincing, and cogent evidence that D.C. exhibited a severe deterioration from routine function.

ii.    Care as is essential for health or safety

The record also shows it is highly probable D.C. was unable to make rational choices essential for his health or safety due to his schizophrenia. For example, D.C. denied his schizophrenia diagnosis and told Dr. Parsi and Dr. Archer that he would stop medication upon his release. While D.C. was taking medication with encouragement from the nurses at WSH, D.C. was "ambivalent about taking medication" and he reiterated to Dr. Parsi he would not take his

medication outside of the hospital. 1 VRP (Jan. 19, 2024) at 23. D.C. informed Dr. Archer that he only took medications because they are "mandated" and that he would "discontinue medication, and resume substances" on release. 1 VRP (Jan. 25, 2024) at 48, 55. He informed Dr. Archer that he would continue using marijuana, alcohol, and "a little bit of other substances in the community." 1 VRP (Jan. 25, 2024) at 49. Both experts opined that D.C. would not follow up with health care if released.

Additionally, during D.C.'s time at WSH, he was diagnosed with low blood pressure, but he declined lab work, preventing WSH staff from understanding and addressing his physical health. D.C. also starved himself because of his auditory hallucinations. And WSH staff always had to encourage D.C. to drink fluids. Even with support of WSH staff, D.C. was minimally engaged in treatment. When asked what he would do if he got sick while homeless, D.C. responded, "'[C]ellphone but I don't have, I'd go to Bates school'" and then said he would use marijuana and alcohol. CP at 24.

Based on their examinations of D.C., Dr. Parsi and Dr. Archer opined that D.C. was vulnerable to environmental factors. Such vulnerability and D.C.'s problematic behavior would place him at risk of serious physical harm if released because of his misinterpretations and misunderstandings of situations. For example, D.C. did not understand the situation he was in during the burglary; instead, D.C. believed he "just happened to be there and drink a little bit of ginger beer, and that was it." 1 VRP (Jan. 25, 2024) at 50-51. Without the support of family, D.C. lacked a good discharge plan and stated that he planned to go back to "'the streets.'" CP at 24. Based on D.C.'s hospitalization and decompensation history, D.C. would likely return to his pattern of being in a situation where his safety is at issue and then being hospitalized. D.C.'s

psychotic symptoms—his delusions and abnormal perceptional experiences—required support and treatment to manage his "complex behavioral health needs." 1 VRP (Jan. 25, 2024) at 55.

The court "must consider the symptoms and behavior of the respondent in light of all available evidence concerning the respondent's historical behavior." RCW 71.05.245(1). Additionally,

> great weight shall be given to evidence of a prior history or pattern of decompensation and discontinuation of treatment resulting in: (1) Repeated hospitalizations; or (2) repeated peace officer interventions resulting in . . . criminal charges, diversion programs, or jail admissions. Such evidence may be used to provide a factual basis for concluding that the individual would not receive, if released, such care as is essential for his or her health or safety.

RCW 71.05.285.

Here, prior to the June 2023 residential burglary, D.C.'s criminal history included three gross misdemeanors—two criminal trespasses and a third-degree malicious mischief—and four misdemeanors of criminal trespass, and an unclassified malicious mischief. Between 2011-2023, D.C. had a total of nine arrests. Furthermore, D.C. had five hospitalizations, three detainments for grave disability, and three detainments for being a danger for property, and a one-month hospitalization for grave disability in 2022. D.C.'s criminal history and hospitalization history itself is a factual basis for concluding that D.C. would not receive, if released from WSH, such care as is essential for his health or safety. Each time D.C. was released, he was again hospitalized or had repeated peace officer interventions. D.C.'s history is a prime example of the "'revolving door' syndrome" that prong (b) was intended to address. *LaBelle*, 107 Wn.2d at 206 (quoting Nancy K. Rhoden, *The Limits of Liberty: Deinstitutionalization, Homelessness, and Libertarian Theory*, 31 EMORY L.J. 375, 391 (1982)).

24

No. 59344-1-II

There was substantial evidence that clearly, cogently, and convincingly showed that D.C. was unable to make rational choices essential for his health or safety due to his unspecified schizophrenia disorder. Thus, sufficient clear, cogent, and convincing evidence supports the superior court's conclusion that D.C. was gravely disabled under RCW 71.05.020(25)(b).

CONCLUSION

We affirm the superior court's order committing D.C. to a 90-day civil commitment and authorizing involuntary treatment.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, P.J.

Glasgow, J.

25